RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

STEPHEN CAUDLE,

        *Plaintiff-Appellant*,

    *v.*

HARD DRIVE EXPRESS, INC.; JAMES BETZ,

        *Defendants-Appellees*.

> No. 23-1145

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-11445—Terrence George Berg, District Judge.

Argued: October 26, 2023

Decided and Filed: February 7, 2024

Before: WHITE, STRANCH, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Keith Flynn, MILLER COHEN, P.L.C., Detroit, Michigan, for Appellant. Guy C. Vining, VINING LAW GROUP, PLC, Taylor, Michigan, for Appellees. **ON BRIEF:** Keith Flynn, MILLER COHEN, P.L.C., Detroit, Michigan, for Appellant. Barbara D. Urlaub, GASIOREK MORGAN Farmington Hills, Michigan, for Appellees.

───────────────

## OPINION

───────────────

HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant Stephen Caudle appeals the grant of summary judgment to his employer in this Fair Labor Standards Act (FLSA) and Michigan Whistleblower Protection Act (WPA) case, alleging that he was fired in retaliation for

attempting to report unlawful employment practices.  We REVERSE and REMAND for further proceedings.

**I.**

Caudle began working as a truck driver for Defendant-Appellee Hard Drive Express, Inc. (Hard Drive), owned by Defendant-Appellee James Betz, in August 2015.  Like other drivers, he was paid by the mile rather than on a salary or hourly basis, a practice Betz testified is standard in the industry.  According to Betz, driver pay was approximately $0.45 per mile in 2015, at the beginning of Caudle's employment, and increased to around $0.58 per mile by the time Caudle's employment was terminated.  Although Hard Drive's drivers averaged 2,500 to 2,700 miles a week, Caudle, "a hustler" and "hard runner," averaged 3,500 miles.  R.37-3, PID 415.

Driver pay also included additional flat fees, for "stop pay, delay[,] and drop and hook," and drivers received a $0.02 per mile "Safety and Performance" bonus.[1]  R.37-8, PID 489;  R.37-11, PID 533.  The bonus, according to Betz, rewarded drivers for "doing [their] job safely" and "on time."  R.37-3, PID 405.  It also compensated them for time spent performing maintenance tasks and required inspections outside their on-duty driving time.  However, Hard Drive could suspend the bonus if a driver committed a safety infraction; Caudle's safety and performance bonus was suspended for thirteen weeks in 2018 after he damaged another truck.

Additionally, in January 2019, Hard Drive implemented a paid-time-off policy.  The policy provided drivers five paid days off per year, subject to several conditions, including that drivers were required to give thirty days' notice before the paid time off, and were also required to work the two weeks immediately before and immediately after the days off.

Caudle conceded at summary judgment that his pay for "regular work hours" exceeded minimum wage; however, he "contest[ed] that he was paid minimum wage for all hours" worked.  R.38, PID 690.  According to Caudle, Hard Drive repeatedly failed to reimburse him for the time and expense of repairing and servicing company-owned trucks.  Caudle asserted that

---

[1]Although Betz testified in his deposition that the performance bonus was three cents per mile, the materials submitted by Defendants in support of their summary judgment motion otherwise reflect that it was two cents per mile.

although he sometimes made repairs himself, paid for repairs or parts himself, and "was at times required to drive over 100 miles or more to obtain parts," Hard Drive failed to compensate his time and reimburse his expenses. R.38-2, PID 724. Defendants argued Caudle himself was responsible for any failure to obtain reimbursement for amounts spent on repairs. According to Defendants, drivers were directed to have repairs and maintenance performed by vendors with whom Hard Drive had accounts; those vendors would then bill Hard Drive directly. If drivers did need to pay for maintenance or parts themselves, they would be reimbursed by Hard Drive after submitting receipts. Defendants maintained that they had no record of Caudle submitting receipts. Caudle asserted that he did submit receipts for reimbursement but could not produce them because he did not keep originals. Further, Defendants claimed they instructed Caudle not to perform most repairs himself and instead to rely on professional mechanics. Caudle disputed this, attesting that Hard Drive management encouraged him to perform mechanical work such as changing fuel filters and provided him with tools to do so.

Both sides agreed that Caudle complained about various Hard Drive policies throughout his employment, including lack of reimbursement for repairs and the time spent securing or performing those repairs. Although he did not give specific detail, Betz testified that Caudle "threatened" that Hard Drive's failure to pay him for time spent on the truck's maintenance or servicing "was illegal several times." R.37-3, PID 425. He also testified that Caudle threatened to report him to the Department of Transportation after Betz directed him to drive a short distance in a storm for safety reasons even though Caudle had reached his maximum hours limit. Similarly, Betz attested in an affidavit that Caudle "quibbled with [Betz] over various company policies that he did not like," including policies "governing the tractor's speed, [his] loss of safety bonus, reimbursement for damages due to his negligence, drop and hook fees, [and] compensation for routine maintenance and alleged unpaid reimbursements." R.37-7, PID 482–83. Betz further attested that "on several occasions, [Caudle] . . . threatened to report the company to government authorities." *Id.* at PID 483.

This contentious relationship culminated in the termination of Caudle's employment on February 15, 2019, after a series of text messages between Caudle and Betz. According to Caudle's text-message records, the exchange began at 12:56 p.m:[2]

Caudle: How does that vacation pay work I need to take some time off here soon

Betz: Must fill out vacation request form 30 days in advance. Must work the 2 weeks before vacation and the 2 weeks after vacation in order to receive your paid days off pay. It is not called vacation pay.

Caudle: You get it for me and sick as well right

Caudle: Never mind buddy I'm not gonna play any games with you I had text first two weeks of March off my wife's getting operated on

Betz: However you want to use it. It will not be paid until you work 2 full weeks after. Not letting anyone pull any tricks. According to the labor department, I'm giving this as a gift and I do not have to pay if an employee tries to pull a fast one.

Caudle: I understand man don't worry about it people only treat people they work for the way they treat

Caudle: Them. Just remember that

Betz: Another word, I make loans with no interest and still expect to pay to have something done for the truck.

Caudle: That's right your truck your company I'll get my money don't worry about it I'm not gonna argue with you I'll go to the proper channels I've been down this road before I've let it go because things are going pretty good but you're the want to change not me

Betz: Your the one that doesn't understand. I help all the people that work for one way or another. Like make loans. Then not charge them any interest like a bank would. Then ask someone to take a truck to get something taken care of and they want paid for it. It has made me very bitter. I don't mind helping anyone, but get the shit I get after I have help them not going to happen anymore. I'm no longer a bank.

Betz: Can I call you later?

Caudle: I give you 10 minutes buddy I'm on my way to the labor board I'm done playing with you you call me will work this out and Pandora's box won't open very disappointed and you

Betz: Bud, I have nothing to be scared of, go ahead. You can threaten me all you want doesn't bother me one bit. Their is absolutely nothing in the laws that says I

---

[2]The text records do not include timestamps for every text but indicate that Betz told Caudle "Michigan is an at will state. That means I can get rid of someone for any reason" at 1:40 p.m. R.37-17, PID 544.

have to give you paid days off. Why do you think I sat it up the way I did, so employees can't screw me. You have been paid every nickel that you earn. You what you think is best. Park the e driverstruck and make sure it is in the same shape you receive it, because I can hold your checks until I check out the truck. It is in the driver's handbook. I will be coming to get the truck at the beginning of the week.

Betz: Also, Michigan is an at will state. That means I can get rid of someone for any reason.

Caudle: Your truck will be in a secure location you will not get it until I get all my money you have yourself a great day buddy

Caudle: And I got the email of every employee you got and I'm going to let them know what the labor law says they will get paid for service on their truck they will get paid for changing their own fuel filters In our conversation had nothing to do with getting pays for days off and I'm not that stupid

Betz: You will not get paid until I get my truck. Driver handbook is very clear on how it works. You can hold on to the truck if you want. The day I show up to pickup and I cannot get it, I will start charging you detention pay for each day you hold it. You will eventually not have any thing coming.

Caudle: You're funny

Betz: You are the only one who insists on changing your filters cause you don't want to stop. No one else does any work on their truck. Send them an email and you will find out.

Betz: We are done with this conversation. If you want paid what you are owed, make the truck available Monday.

Betz: The truck will be taken straight to a dealership to get completely checked out. To make sure nothing was done to it. After your threats, I don't trust you.

R.37-17, PID 543–44. Parallel to these texts, Betz's phone records show three calls from Caudle that afternoon—a one-minute call at 1:32 p.m., a one-minute call at 1:44 p.m., and an eight-minute call at 2:03 p.m.

The next day, as Betz and Caudle continued to argue, Betz texted Caudle: "Michigan is an (At Will) state. This means I can terminate anyone for no reason. In your case, you were and have several times been argumentative with me and the office. I decided you no longer needed to be employed with Hard Drive Express." *Id.* at PID 546. In interrogatories, Defendants reiterated that "[t]he direct cause of the termination was [Caudle's] insubordinate and outrageous arguments with Mr. Betz including repeated swearing." R.38-10, PID 844. Caudle maintained

that he did not use profanity when he spoke to Betz on February 15 or when he requested reimbursement on prior occasions. He acknowledged that he and Betz "[got] into arguments during my employment where we both cursed at each other," but asserted he "was never disciplined for this" and that it was "not uncommon" for other drivers and Betz himself to use profanity on the job. R.38-2, PID 724–25.

Following the termination of his employment, Caudle filed this suit against Hard Drive and Betz alleging that Defendants' actions constituted unlawful retaliation in violation of the FLSA, 29 U.S.C. § 201 *et seq.*, and the Michigan WPA, Mich. Comp. Laws § 15.361 *et seq.* Defendants moved for summary judgment, arguing: (1) Caudle's complaints of "non-specific wage and hour violations" could not serve as the basis for an FLSA claim, R.37, PID 363; (2) as a motor carrier employee, Caudle was exempted from FLSA protections; and (3) Caudle's WPA claim should fail because he neither participated in protected activities nor could establish a causal connection between his complaints and his discharge.

## II.

The district court granted summary judgment after interpreting Caudle's text messages to concern only Hard Drive's paid-time-off policy. It concluded that neither the FLSA nor Michigan law guarantees or regulates vacation pay and therefore held that (1) Caudle's FLSA claim failed because Hard Drive had no notice that he was asserting rights under the statute, and (2) his state-law claim failed because complaints about vacation pay could not constitute protected activity covered by the Michigan WPA. However, because there is a genuine factual dispute regarding whether Caudle's complaints concerned vacation pay or Defendants' asserted failures to compensate Caudle for the time and money he spent on repairs, the district court erred in granting summary judgment.

### A.

"We review a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). The moving party must establish that there is "no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a),

which requires showing that no "reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmoving party must then use "specific facts" to demonstrate that "a genuine issue for trial" exists; otherwise, summary judgment is warranted.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**B.**

Caudle maintains that Defendants' actions constituted unlawful retaliation in violation of the FLSA.  Among other employee protections, the FLSA sets requirements for a minimum wage, 29 U.S.C. § 206(a), and overtime pay, *id.* § 207(a).  Additionally, the FLSA contains an antiretaliation provision that makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  *Id.* § 215(a)(3).  A plaintiff must show four elements to establish a prima facie case of retaliation under § 215:

> (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006).  Under the *McDonnell Douglas* framework, which applies to FLSA retaliation claims, if the plaintiff establishes a prima facie case, "the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action."  *Id.*  The plaintiff must then prove the defendant's proffered reasons were pretextual.  *Id.*

The district court concluded—and Defendants do not contest on appeal—that the text exchange satisfied Caudle's burden as to the first, third, and fourth elements:  he complained and threatened to report his employer (protected activity), and his employer fired him (adverse action) shortly afterward (causation).  However, the district court held that Caudle's claim failed on the notice element.  The district court read the text exchange as giving Defendants notice only that Caudle intended to report them for their paid-time-off policy.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) ("To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable

employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."). And although the antiretaliation provision applies to complaints and proceedings both "under or related" to the FLSA, 29 U.S.C. § 215(a)(3), the district court concluded that vacation pay was unprotected under the FLSA and could not form the basis for a retaliation claim.

The district court relied on three portions of the exchange to conclude that Caudle's intended complaint related only to vacation pay. First, Caudle initiated the exchange by asking about the paid-time-off policy, rather than raising the reimbursement issue. *See* R.37-17, PID 543 ("How does that vacation pay work I need to take some time off here soon[.]"). And Caudle did not bring up repair reimbursements—Betz raised the issue himself. *Id.* at PID 544 ("Another word, I make loans with no interest and still expect to pay to have something done for the truck."). Second, Betz's response to Caudle's statement that he was on his way to the labor board indicated that Betz understood Caudle's complaint to concern the paid-time-off policy: "I have nothing to be scared of, go ahead . . . . [There] is absolutely nothing in the laws that says I have to give you paid days off." *Id.* Third, Caudle threatened to tell Hard Drive's employees that the law required they "get paid for service on their truck" and clarified that "our conversation had nothing to do with getting [paid] for days off" only after Betz fired him. *Id.*

Although the district court's interpretation of the exchange is a plausible reading, other messages in the text chain cut the other way. For example, when Betz initially brought up the reimbursement issue, Caudle responded: "That's right your truck your company I'll get my money don't worry about it I'm not gonna argue with you I'll go to the proper channels I've been down this road before." *Id.* Defendants argue that by "I'll get my money" and "I'll go to the proper channels," Caudle was referring to vacation pay and his objections to the paid-time-off policy; Caudle argues he was referring to repair costs. Given the muddled nature of the back-and-forth between the two, the message could support either reading. Additionally, Caudle's statement that he was on his way to the labor board came in response to a message from Betz complaining that he was asked to reimburse truck maintenance even though he made no-interest loans to drivers:

> Betz:  Your the one that doesn't understand.  I help all the people that work for one way or another.  Like make loans.  Then not charge them any interest like a bank would.  Then ask someone to take a truck to get something taken care of and they want paid for it.  It has made me very bitter.  I don't mind helping anyone, but get the shit I get after I have help them not going to happen anymore.  I'm no longer a bank.  Can I call you later?
>
> Caudle:  I give you 10 minutes buddy I'm on my way to the labor board I'm done playing with you you call me will work this out and Pandora's box won't open very disappointed and you.

*Id.*  Because a reasonable jury could find that these messages put Defendants on notice that Caudle intended to report them for their asserted failure to compensate drivers for repairs, summary judgment should not have been granted.

Additionally, beyond providing context for the February 15 texts, Caudle's prior complaints about reimbursements provide another potential grounding for his FLSA claim.  The district court held that the prior complaints did constitute protected activity under the FLSA, as it covers informal and internal complaints.  *See Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004); *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989–90 (6th Cir. 1992).  It concluded, however, that these complaints did "not appear to be more than mere grumblings" that failed to satisfy the notice requirement.  R.47, PID 1482.  In reaching this conclusion, the court distinguished Caudle's earlier complaints from a case in which the plaintiff's "numerous internal complaints" included one that cited FLSA penalties; it also noted that Caudle failed to produce records of unreimbursed expenses.  *Id.* (citing *Morris v. Aon Serv. Corp.*, 2011 WL 5864757 (E.D. Mich. Nov. 22, 2011)).  But as Defendants themselves admitted in their summary judgment motion, "Plaintiff repeatedly complained (commencing in 2017) and *threatened to report the company* . . . about alleged unpaid services or non-reimbursed, out-of-pocket expenses."  R.37, PID 348 (emphasis added).  The district court did not explain why, given those threats, the complaints were too indefinite to place Defendants on notice that Caudle was asserting statutory rights.  *See Romeo Cmty. Schs.*, 976 F.2d at 989–90 (holding that evidence plaintiff stopped receiving work after telling her employer "she believed they were 'breaking some sort of law'" stated a claim of FLSA retaliation).  And to the extent that Caudle must establish that Hard Drive in fact failed to reimburse him, he submitted an affidavit stating that he turned in receipts to Betz and was not reimbursed.  This is competent evidence to overcome

summary judgment, even if the lack of corroborating documentation (and conflicting attestations from Defendants) might affect how a jury weighs it.  *See* Fed. R. Civ. P. 56(c)(1)(A) (record materials that can establish a factual dispute include "affidavits or declarations").  Caudle is therefore correct that his prior complaints meet the first two elements of an FLSA retaliation claim.

Accordingly, we reverse the district court's grant of summary judgment on Caudle's FLSA claim.  And because the district court also granted summary judgment on Caudle's WPA claim[3] on the basis that the text-exchange complaint and threat to report Hard Drive related only to vacation pay, we reverse that grant of summary judgment as well.

## III.

For these reasons, we REVERSE the order granting summary judgment for Defendants and REMAND for further proceedings consistent with this opinion.

---

[3]The WPA provides that:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws. § 15.362.