NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0451n.06

Case No. 24-1584

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>DANIEL WELCH,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>HEART TRUSS & ENGINEERING CORP.,<br><br>    Defendant-Appellee.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN<br><br>OPINION</td></tr>
</table>

**FILED**
Oct 06, 2025
KELLY L. STEPHENS, Clerk

Before: COLE, STRANCH, and READLER, Circuit Judges.

READLER, Circuit Judge. Heart Truss & Engineering Corp. fired Daniel Welch, believing that Welch was responsible for painting graffiti on trusses that were later delivered to the company's customers. Welch, however, viewed Heart Truss's justification for his termination as pretext for disability-based discrimination and workers' compensation retaliation, prompting this lawsuit. The district court disagreed and granted summary judgment to Heart Truss. We affirm.

I.

For years, Welch worked as a delivery driver for Heart Truss. In that role, Welch transported stacks of trusses from Heart Truss's manufacturing facility to construction sites, where the trusses were used to support the roofs of residential and commercial structures. Welch, upon arriving at a job site, was required to climb onto the bed of his truck to secure straps around each truss before it was lifted from the truck bed by crane.

Unfortunately, Welch's work came with some risk of injury. Case in point, in 2017, Welch injured his left knee when he fell off a load of trusses. About two years later, he aggravated the injury. This time, he filed a workers' compensation claim, which an independent clinic later denied. Late in 2020, Welch injured his ankle, filed another claim, and was granted paid medical leave to recover from the ensuing surgery. He returned to work in March 2021.

At that point, Welch's still-untreated knee injury caused him to walk with a limp, something his supervisor Bryan Johnson noticed and asked him about. According to Johnson's memorial of the conversation, Welch complained to Johnson about "how the company screwed him" on his left-knee injury by orchestrating the denial of his workers' compensation claim and relayed that "it hurt to climb up and down on the loads" with the "3 tears in his meniscus." Mar. 26, 2021, Letter, R. 25-4, PageID 214. Welch later told Johnson that he had found a way to do his job without climbing but that "one day (coming soon)" he would be unable to do his job at all, cryptically adding, "then we will see what happens." *Id.* Welch denied saying these things, instead claiming that he merely told Johnson he "still had an injury and . . . needed to go see [his] doctor." Welch Dep., R. 25-1, PageID 191. Based on Johnson's written account of the conversation, plant manager Tom Gustafson reassigned Welch from driving to working on the factory production line—a role that did not require climbing but also paid less than the delivery driver role. Gustafson and Welch had two conversations over the transfer, which Welch surreptitiously recorded on his cellphone.

Shortly thereafter, graffiti started appearing on loads of trusses that were shipped to customers, including smiley faces (some adorned with devil horns) and pairs of circles with dots in the middle that some customers interpreted to be depictions of female breasts. Upset at the defacement, customers complained. In one instance, a customer called Heart Truss to ask whether

the company considered it "appropriate [to] sen[d] product[s] to their home to sit in their front yard with a pair of boobs on the front." Gustafson Dep., R. 26-8, PageID 427.

Deeming this a "very bad look for the company," *id.*, PageID 429, Gustafson immediately "started to think about [discharging] whoever [was] doing" the graffiti, *id.*, PageID 419. And after finding more defaced trusses still at the factory, Gustafson concluded that the amount and nature of the graffiti warranted discharge. So, he turned to finding the culprit, who had to be someone at the production facility, given what Gustafson had learned. The company's production facility is staffed with two successive shifts, the first of which (including Welch) had left for the day when Gustafson began his investigation. Thus, Gustafson began with the second shift, ascertaining that none of those workers was responsible for the graffiti. The next morning, April 15, 2021, Gustafson instructed first-shift supervisor Tim Oberlin to see whether one of his workers was the artist, noting that he planned to have the culpable employee "discharged." *Id.*, PageID 420.

According to Oberlin, he then went to the production yard and asked employee Ryan Wixson if he had painted the graffiti. Wixson replied that he had not. Welch, who was within earshot, "spoke up and said, 'I did it,'" downplaying the offense by asking, "[W]hat's it hurting?" Oberlin Aff., R. 25-12, PageID 253. During litigation, Wixson corroborated Oberlin's account. Welch, however, told a different story. He claimed that Oberlin merely "showed [the first-shift workers] pictures of trusses" and said, "Whoever is doing this, just stop," at which point Welch did not confess but merely commented, "[W]hat about the graffiti that's all over the door on the side of the building?" Welch Dep., R. 25-1, PageID 197.

Following this exchange, Oberlin returned to Gustafson's office, where he told Gustafson that Welch had confessed. Gustafson immediately informed his superior that he was planning to terminate Welch for defacing company property. To Gustafson's mind, Welch had violated Shop

3

Rule 28, which authorized discipline of "up to discharge" for a first-time offender caught "[d]efacing company . . . property." Shop Rules and Penalties, R. 26-1, PageID 323.

Later that day, Welch claimed to have experienced yet another injury, this time to his right knee, while working on the production line. When Welch requested medical care, Gustafson arranged transportation to the workers' compensation clinic. Following an evaluation, Welch was released to return to work. When he did, he was informed of his termination.

Welch later filed suit against Heart Truss for wrongful demotion and wrongful termination, arguing that his transfer and firing were the product of illegal discrimination and retaliation. The district court granted Heart Truss summary judgment on the wrongful termination claims. Following a settlement of his wrongful demotion claims, Welch appealed the district court's resolution of his wrongful termination claims.

## II.

We review de novo the grant of summary judgment to Heart Truss, drawing all reasonable inferences in Welch's favor but affirming if Heart Truss shows that there was no genuine dispute of material fact and that it was entitled to judgment as a matter of law. *Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022). Welch asserted disability-based discrimination claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, and Michigan's analogous Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101, which generally incorporates the same legal standards as the ADA, *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (explaining that the two are "generally analyzed identically." (quoting *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 497 (6th Cir. 2015))). According to Welch, Heart Truss violated these statutes by terminating him based on his long-term left-knee injury. Welch also sued for retaliation under Michigan's Worker's Disability Compensation Act of 1969, Mich. Comp. Laws § 418.301,

claiming that he was fired in retaliation for requesting medical care after his April 15 injury, the day he was terminated.

On each claim, Welch proffered no direct evidence that Heart Truss's alleged illegal motive—discrimination or retaliation—caused his termination. Thus, he must prove his claims through circumstantial evidence, a task that invokes the *McDonnell Douglas* framework. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (citing *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)); *Cuddington v. United Health Servs., Inc.*, 826 N.W.2d 519, 525–26 (Mich. Ct. App. 2012) (per curiam). Under that familiar rubric, Welch must present a prima facie case of discrimination or retaliation. *A.C. ex rel. J.C.*, 711 F.3d at 697. To establish a prima facie case of disability discrimination, Welch must show that (1) he is disabled, (2) he was otherwise qualified for his position, with or without a reasonable accommodation, (3) he suffered an adverse employment decision, (4) Heart Truss knew or had reason to know of his disability, and (5) his position remained open while Heart Truss sought other applicants or replaced him. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (stating prima facie case under the ADA); *Hrdlicka*, 63 F.4th at 566 (using the same framework for disability discrimination claims under the ADA and the PWDCRA). And to establish a prima facie case of retaliation under Michigan's Workers' Disability Compensation Act, Welch must show that (1) he asserted his worker's compensation rights, (2) Heart Truss laid off or failed to recall Welch, (3) Heart Truss's stated reason for its actions was a pretext, and (4) Heart Truss's true reason for firing Welch was in retaliation for his having filed a worker's compensation claim. *MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 727 (6th Cir. 2012) (per curiam) (citing *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 404 (Mich. Ct. App. 1999) (per curiam)). If Welch establishes a prima

facie case, the burden shifts to Heart Truss to provide a legitimate reason for firing him. *Id.* And if Heart Truss does so, Welch must show this reason to be pretextual. *Id.*

For purposes of its summary judgment motion, Heart Truss concedes that Welch has established a prima facie case of discrimination and retaliation. Welch does not contest that Heart Truss has proffered a legitimate, non-discriminatory reason for his termination. Therefore, for argument's sake, we will assume that *McDonnell Douglas*'s first two steps have been satisfied, meaning that, like the parties, we focus on the last step: whether Welch has put forward enough evidence from which a jury may reasonably reject Heart Truss's explanation that it fired Welch for defacing trusses, and conclude that its proffered reason was a pretext for discrimination or retaliation. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) ("To satisfy her burden and survive summary judgment, [a plaintiff] must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her." (citation modified)). To do so, Welch would need to do more than "simply" ask "the jury . . . to refuse to believe [Heart Truss's] explanation." *Manzer*, 29 F.3d at 1083 (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). Rather, he must present "a sufficient basis *in the evidence*" to find pretext. *Id.*

Welch arranges his evidence on this front into three categories. He argues that Heart Truss's explanation was neither (1) based on facts, (2) a sufficient basis for his termination, nor (3) the likelier actual motivation as compared to discrimination and retaliation. We take each of these in turn.

A. Welch first argues that Gustafson had no factual basis for believing Welch to be the graffiti artist. To prevail here, Welch must overcome Heart Truss's assertion of the "honest belief"

rule, which prevents a finding of pretext, regardless of whether Welch was the actual culprit, if Gustafson "reasonably and honestly relie[d] on particularized facts" in concluding that he was. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). And the record indicates that Gustafson reasonably and honestly relied on particularized facts when terminating Welch's employment. Recall the steps he took to identify the culprit after learning about the graffiti: finding more examples of graffiti, figuring out that the graffiti must have originated at the factory, eliminating the second shift from suspicion, and assigning Oberlin to investigate the first shift. The next data point he received was Oberlin's report of Welch's confession. From this investigation, Gustafson formed the honest belief that Welch was responsible.

Welch counters that this belief, while honest, was nonetheless unreasonable because Gustafson accepted Oberlin's word without interviewing other witnesses or cross-referencing the graffitied job numbers to Welch's assigned loads. Perhaps, as Welch suggests, Gustafson could have done more to confirm Welch's guilt. But the honest belief rule does not require an "optimal" investigation that "left no stone unturned." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (citation modified). Rather, we ask only if Gustafson's decision was "reasonably informed and considered." *Id.* (citation modified). And here, we agree that it was, given that Welch has produced no evidence that Gustafson had reason to disbelieve Oberlin's report.

Pressing this point further, Welch, citing *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634 (6th Cir. 2015), asserts that a company may not invoke the honest belief rule where it bases a termination solely on a supervisor's account of events. But the court in *Yazdian* found that the company there acted unreasonably in relying solely on a supervisor's statement because the company had notice of two reasons to doubt the supervisor's word—the employee's request to present his side of the story and his allegation that the reporting supervisor discriminated

against him. *Id.* at 654. In view of this live dispute over the supervisor's veracity and impartiality, firing the employee without any follow-up was deemed unreasonable. *Id.* But there is no evidence in the record that Gustafson had reason to doubt the accuracy or objectivity of Oberlin's statements, making his reliance reasonable.

B. Welch next argues that the graffiti was not a sufficient reason for Gustafson to fire him, as others engaged in the same conduct, yet were not terminated. For this type of pretext argument, Welch ordinarily must provide evidence that "other employees, particularly employees not in the protected class"—who were not disabled or who had not sought protected medical care—"were not fired even though they engaged in substantially identical conduct." *Manzer*, 29 F.3d at 1084. In making this comparison, we "focus on the severity of the differently treated employees' actions," an inquiry that sweeps in both the "company rule or policy" violated and "the actual and potential consequences of the employee's actions." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 780 (6th Cir. 2016) (citation modified).

Welch identifies one employee who violated Rule 28 without being terminated: Mike Reyes, who spray-painted the inside of a forklift and received a two-day suspension. The forklift, however, was only used inside Heart Truss's plant. The graffiti marks on the trusses, on the other hand, were seen by customers as well as any drivers who passed the company truck during transportation. The resulting effect on Heart Truss's reputation was an "actual . . . consequence[]" of Welch's graffiti that differentiated the "severity" of that offense from Reyes's forklift artwork. *See Jackson*, 814 F.3d at 780 (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002)).

Nor is it enough for Welch to assert more generally that graffiti was a "common" problem at Heart Truss. Appellant Br. 36. True, it seems that other, unknown culprits defaced trusses prior to Welch's termination. But Welch has proffered no evidence that any employee who was *caught*

8

graffitiing trusses ever avoided termination. And as Welch did not provide any details about the prior truss graffiti, we have no comparator to consider. In short, with Welch lacking evidence that any employee committed "substantially identical" misconduct, he has failed to prove pretext under this rubric. *See Manzer*, 29 F.3d at 1084.

C. We commit the bulk of our analysis to Welch's third and final claim, namely, that Heart Truss's stated reason for his termination, even if true and even if a sufficient basis for firing, was not its actual motivation. To succeed on this argument, Welch must first "admit[]" (for argument's sake) that he drew the eyes, devil horns, and breasts seen by Heart Truss's customers and that this conduct "*could* [have] motivate[d]" the company to fire him. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). Then, he must present evidence that could convince a jury it is still "more likely," under the "sheer weight of the circumstantial evidence," that Heart Truss fired him based on "an illegal motivation" tied to his disability or workers' compensation requests rather than his "admit[ted]" fireable misconduct. *Manzer*, 29 F.3d at 1084. To this end, Welch offers several pieces of circumstantial evidence purporting to make discrimination or retaliation the likelier explanation here than ordinary workplace discipline.

1. Welch begins by arguing that the reason for his firing "subtly changed over time." Appellant Br. 38. To be sure, "shifting termination rationales" may suggest that a legitimate reason given for one's termination during later litigation over that termination "may not have been the true motivation" for the termination. *Miles*, 946 F.3d at 890. But "providing *additional*, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications." *Id.* at 891 (citation modified). And the evidence shows that is exactly what Heart Truss did. Welch's termination notice credited his firing to "Rule # 28" "Defacing company property." Reprimand, R. 25-17, PageID 271. The company's EEOC

position statement and its subsequent litigation position added detail to those allegations. But there is no evidence in the record that the company ever retreated from its position that the Rule 28 violation was itself sufficient to justify Welch's termination. Put differently, that Heart Truss's factual support for Welch's firing grew more specific over time does not show that Heart Truss changed or hid its true motives underlying that decision.

2. Next, Welch suggests that Heart Truss failed to follow its own policies as it terminated Welch's employment. That manner of shortcoming, however, "is generally insufficient to support a finding of pretext" unless the company's policy was not applied "uniformly" across employees. *Miles*, 946 F.3d at 896 (citation modified). Welch has not demonstrated as much. And even assuming an isolated failure to follow company termination policies could demonstrate pretext, Welch similarly has shown none. Gustafson did not ignore the Shop Rules' instruction to account for "the nature and frequency of the violations" by terminating Welch for a first-time Rule 28 offense. *See* Shop Rules and Penalties, R. 26-1, PageID 321. To the contrary, Gustafson weighed those very considerations—he relied on "[t]he severity of what [Welch] had done" to select discharge as the appropriate discipline. Gustafson Dep., R. 26-8, PageID 437. Nor did Gustafson violate Rule 34, which instructs Heart Truss to forgive and remove discipline from an employee's file after one year. Gustafson testified that Welch's prior discipline played no role in his decision. In response, Welch points to the company's EEOC position statement, which referenced the forgiven disciplinary incidents. But the company's owner (who prepared that filing) was not involved in firing Welch. So, that document's reference to prior discipline does not establish that Gustafson violated company policy, nor does it establish that Heart Truss's proffered reason was pretextual. *Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008) (citing *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements by nondecisionmakers, or statements by

decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus.")).

3.  Welch next asserts that Gustafson showed hostility towards Welch's protected characteristics—his disabled status and his history of requesting workers' compensation—during the pair of recorded conversations the two had at the time of Welch's demotion (about two weeks before his termination). Hostility can be shown through repeated inflammatory comments targeting the protected trait. *See, e.g.*, *Griffin v. Finkbeiner*, 689 F.3d 584, 589–90, 596 (6th Cir. 2012) (discussing race-based comments). But the comments Welch points to here are not inflammatory comments targeting Welch's protected traits—his 2017 knee injury, his aggravation of that injury in 2019, his filing of a worker's compensation claim in 2019, or his 2021 ankle injury.

Instead, during those conversations, Gustafson attempted to explain the company's safety concerns relating to Welch's knee. Welch responded by debating the cause of his lingering injury, tying the injury to the denial of his previous workers' compensation claim, for which he blamed Heart Truss. In refocusing the discussion back to the company's safety concerns, Gustafson also briefly highlighted Heart Truss's lack of any role in the clinic's denial of Welch's claim. Absent throughout these extended conversations is any hint that Gustafson harbored hostility towards Welch based on his knee injury or his filing of workers' compensation claims.

Resisting this conclusion, Welch takes several quotes out of context and paints them as evidence of illegal bias. For example, Welch argues that Gustafson's statements about being "familiar" with Welch's injury history and his previous "litigation" with the company, *see* Mar. 29, 2021, Conversation, R. 26-2, PageID 328, 333, were "inflammatory" because Gustafson "expressly referenced" Welch's "work-related injuries" in explaining why he was demoted, Reply

Br. 9. But these statements go only to Gustafson's *awareness* of Welch's protected activity (his disability and his workers' compensation claims); they do not show any animus on that front. And mere awareness, while essential to making out a prima facie case of discrimination or retaliation, is not enough to show pretext. *See Witham v. Intown Suites Louisville Ne., LLC*, 815 F.3d 260, 264 (6th Cir. 2016).

So too for Gustafson's warning that Welch would be "discharge[d]" if he "falsif[ied] an investigation." Mar. 29, 2021, Conversation, R. 26-2, PageID 329; *see also id.* ("I'm letting you know where you stand."). Here, Gustafson was responding to Welch's cryptic comment to Johnson that "one day (coming soon)" he would be unable to do his job. Mar. 26, 2021, Letter, R. 25-4, PageID 214. From that comment, Gustafson could fairly wonder whether Welch might have plans to stage a career-ending injury. He showed no illegal animus in reminding Welch of the consequences of such a charade.

Welch also tries to analogize Gustafson's comment acknowledging Welch's "ache[s] and . . . pain[s]" on the job, Mar. 30, 2021, Conversation, R. 26-3, PageID 341, to statements that provided evidence of pretext in *Brewer v. New Era, Inc.*, 564 F. App'x 834 (6th Cir. 2014). Fairly read, however, this passing comment was nothing like the inflammatory statements in *Brewer*. In response to Welch's complaint that his new role in production was, in his estimation, more physically demanding than his old one as a delivery driver, Gustafson pointed out the obvious— that the heavy work at Heart Truss would cause Welch some discomfort no matter what role he worked. This is a far cry from *Brewer*, where a supervisor made repeated comments that the age-discrimination plaintiffs were "too old" and "needed to retire" in the leadup to their termination.

*Id.* at 839, 841. Gustafson's comments, in short, never presented Welch's "ache[s] and . . . pain[s]" as a negative or as a reason for differential treatment.

Nor was there anything wrong with Gustafson pointing out, amid Welch's repeated complaints about his lingering knee injury, that Welch could have used his health insurance to address the issue during his six months of paid leave for his ankle injury. Welch interprets these comments as pressure not to file a workers' compensation claim for his knee injury. But this gets the timeline wrong. Welch had filed that claim—and had it rejected—years before this conversation. Viewed in this light, Gustafson was simply pointing out a realistic, present-day alternative to working through pain.

Finally, Welch claims that Gustafson lied to him by promising to speak with Johnson as well as the company's owner about Welch's situation, something that apparently did not happen. Skipping over the many plausible, non-deceptive explanations for this failure, there is nothing in the record to link Gustafson's possible deceit with hostility towards Welch's protected classes. Gustafson's statement may simply have been a way to wrap up a long, frustrating conversation, a motive that violates no civil rights law. Indeed, Welch acknowledges that Gustafson became increasingly frustrated as the conversations went on. *See, e.g.*, Mar. 29, 2021, Conversation, R. 26-2, PageID 330 ("I have a lot to do today . . . . [W]e're not gonna talk about it now."); *id.* at PageID 331 ("[I'm angry at you] [b]ecause you're mad at me."). But that fact too does not show retaliatory or discriminatory animus, as opposed to the honest reaction to a repetitive conversation Gustafson was ready to conclude.

Taking all of this together, it is helpful to compare Gustafson's allegedly biased statements with those that provided evidence of pretext in *Griffin*. There, the decisionmaker's racially charged comments—for example, "thank[ing] God" that "[he] was not raised poor and black" and calling

a black employee "King Kong"—revealed that he harbored animus based on the protected classification itself—the victim's race. *Griffin*, 689 F.3d at 589, 596. But, as explained, Gustafson's comments do not evince hostility towards Welch *on account of* his disability or workers' compensation activity.

Welch pushes back on two other fronts. First, he argues that the district court's interpretation of the entire conversation as benign and work-related rather than evidence of discriminatory animus runs afoul of our decision in *Caudle v. Hard Drive Express, Inc.*, 91 F.4th 1233 (6th Cir. 2024). There, we found that it was for the jury to decide whether a manager knew about the plaintiff's protected FLSA activity based on the text conversation between the two. *Id.* at 1239. But here, Gustafson's awareness is neither at issue nor sufficient to show pretext. *See Witham*, 815 F.3d at 264. And, as shown above, no jury could find that the conversation here provides evidence of pretext.

Finally, Welch highlights the district court's finding that the conversation between Gustafson and Welch provided evidence of pretext in Welch's *demotion* claim. It follows, he says, that the conversation must also show pretext in his *termination* claim. But those were two different employment actions, for which the company offered two different justifications. Evidence that one reason was pretext for discrimination or retaliation is not evidence that the other one was as well. *See Manzer*, 29 F.3d at 1084 (noting that this type of pretext argument tries to "indict the credibility of [the] *employer's explanation*" for each employment action (emphasis added)).

4. This leaves Welch's argument that the temporal proximity between his protected activity and his termination creates an inference of pretext. Most fundamentally, this argument fails because the timeline does not support either of Welch's theories. On the disability-discrimination claim, which was based on Welch's long-term left-knee injury, there is no temporal

proximity at all. Heart Truss knew of that condition at least since 2019, when Welch filed his workers' compensation claim. His termination two years later does not show any causal link to that disability, much less that the reason given for that decision was a coverup.

The timeline underlying Welch's retaliation claim is equally unhelpful, albeit for a different reason. The only protected activity tied to this claim is Welch's request for medical care when he suffered his purported new injury on April 15, 2021. But that request was made *after* Gustafson had decided to terminate Welch earlier that morning. An employer who is already contemplating adverse action "need not suspend" its plans upon learning of the protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam).

Welch also seems to base temporal proximity arguments on a different protected activity— his ankle-based medical leave that ended in March 2021. This argument too has multiple flaws. First, this assertion appears nowhere in Welch's complaint, and he may not "expand [his] claims to assert new theories" of protected activity "in response to summary judgment or on appeal." *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citation modified); *see also Golembiewski v. Logie*, 516 F. App'x 476, 478 (6th Cir. 2013) (applying *Bridgeport Music* to plaintiff who argued new unlawful reason for termination in summary judgment response). Second, even if this were a relevant protected activity, the facts do not reflect any pretext on Heart Truss's part. "Temporal proximity cannot be the sole basis for finding pretext," *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citation modified), and Welch has nothing to supplement the weak temporal link here. Welch's medical leave ended a few weeks before he was demoted at the end of March 2021, and he was terminated two weeks after that, meaning the termination followed the end of Welch's leave by about one month. Without any other evidence of pretext,

15

that temporal coincidence cannot show that the company was actually motivated by a discriminatory or retaliatory purpose.

*    *    *    *    *

We affirm.